For the next case, Eric Houston against Workers' Compensation Commission 5100166. Good afternoon, Your Honors. My name is John Foley, and I'm here on behalf of the injured worker Eric Houston. This is an appeal from the Commission's findings that Mr. Houston did not suffer a compensable injury on March 15, 2005 when performing his job for Shawnee College. As a way of background, Mr. Houston was a janitor for Shawnee College and had been employed as a janitor for some 12 years before March 15, 2005. In that job, he was in charge of cleaning at night, a job that he performed on his own, cleaning the cafeteria, moving tables, cleaning and wiping down tables. Prior to March 15, 2005, the evidence in this case indicates that he had some pre-existing back pain. On March 15, 2005, while he was moving tables and cleaning them off, he felt a new sharp pain in his back and went down his leg. Since there was no other supervisor there that evening, he left a note in his supervisor's box. After he completed his shift that same evening, because of his symptoms, he went to the Union County Emergency Room. I think we're fairly familiar with the facts. Let me ask you some pointed questions. Yes, sir. The issue here really turns on not whether the accident occurred in the course of employment, because obviously it would. The dispute centers on whether or not it arose out of his employment. That is, the origin was connected to his employment, correct? Yes. I'm curious. Did you ever ask his treating physicians, Doctors Grieving and Burganti, to render an opinion regarding causation? No, sir. Why not? I had the opinion of Dr. Park. What did Park say? Dr. Park opined that the accident on March 15, 2005, caused him to suffer an annual terror at L4-5. And what did he say that if he had been aware that the plaintiff had very similar symptoms before and after, before March 15, and specifically from an injury in December, or a note from December 2004, that he might change his opinion? Because his annual terror was caused by the table cleaning incident. All right. The problem with that question is that the reference to the record that Dr. Park didn't have in front of him, which was the December 2004 Carbondale Clinic record, having to do with some back pain, the symptoms that were described in there are different than the symptoms that Mr. Houston demonstrated after the March 15, 2005 accident. In particular, what's important to note in the December 2004 record is that the doctor specifically notes no weakness, numbness, or paresthesias of the lower extremities. So that's a bad question. He did not have the same symptoms before that. And therefore, the medical records themselves demonstrate the change there. And if you'll look at the emergency room record of March 16, which is 2 o'clock in the morning following the end of his shift on March 15, you'll see specifically in there the ER doctor notes that there were those symptoms present, that he did have leg weakness, he did have numbness in his leg. And these are changed symptoms from any that had ever been demonstrated by Mr. Houston in the past. Did he acknowledge that the claimant's symptoms were very similar to the symptoms that he had before March 15, 2005? Yeah, I don't think that there's any question that Mr. Houston had had back pain before this. As a matter of fact, he testified. Did Park say that he could not discern whether the annulatory occurred before or after the date without an MRI? I don't believe that Dr. Park agreed that the – I don't think he changed his opinion with regard to the causation of Houston's condition being related to the March 15, 2005 accident. So he never admitted that his opinion about causation might have been different if he'd been aware of the claimant's symptoms before March 15? I think he acknowledged that some of the symptoms that were being reported to him in the questions sounded similar to what he saw before. But I think if you're going to evaluate Dr. Park's opinion in this case, you have to take – I think you have to take it in the context of the fact that he is a treating physician in this case, and you have to read the entire record of treatment leading up to this. Dr. Park was aware that this injured worker had prior symptoms, but he was also aware of the body of treatment leading up to this individual being referred to him for further care. And he was aware that the person following the March 15 accident had had courses of physical therapy, epidural injections, and had had some diagnostic tests which demonstrated abnormalities. Counsel, which theory did you proceed on in this case? The first being that the accident or the activities on March 15, 2005 caused the condition of ill-being, or the activities on March 15, 2005 aggravated a preexisting condition. What theory have you been proceeding on? Well, I think it's both, because I think he had a preexisting condition of low back pain that was aggravated by this accident. Well, I think that much is clear. There's enough record, and certainly the commission found, that his symptoms, his pathology was very similar before and after the accident. So you've got that. Well, I think that's inaccurate, and I think the medical evidence proves that it's inaccurate. All you have to do is, if you would read the medical records before the accident and after the accident that are in this record, you're going to see a marked difference in diagnoses and conditions and treatment. And that's the point. The point is, this changed him. This incident on March 15, 2005 changed his condition and made him worse. And that's the theory that we're proceeding on. That's a preexisting, it's an aggravation of a preexisting condition. If it made him worse, then you're saying it wasn't caused new on March 15. It's both. I'm claiming that, too, because PARP testified that the torn L4-5 disc occurred on March 15, 2005. So then what does his preexisting problems have to do with this case? Well, that's a good question. His preexisting problems only create a problem in this case because they're used as a basis to deny the claim. And the preexisting condition that he had was back pain. The subsequent conditions that he had included sciatica, the torn lumbar L4-5 disc, and neurologic conditions of leg numbness and weakness. Those conditions were never diagnosed before March 15, 2005. And the diagnoses that are in this record was back pain. Plain and simple, nothing else. And as a matter of fact, the only record of anything that was... The diagnosis before the alleged day of accident was back pain and nothing else? That's correct. Well, the December 2004 note specifically says when he strains his back... Let's see. When he strains his back too much, he will sometimes have a shooting pain down either leg to the foot. Right. I stand corrected. He had some pain that was... I stand corrected. The day after, March 16, Dr. Grieving noted it's an occurrence of his back pain. It's been going on for four to five years. And there it says, and Dr. Grieving wrote at that time, now it's occurring 30 to 45 minutes per episode on a daily basis, sometimes multiple times per day. It radiates down either leg occasionally to the foot. Sounds like it wasn't a new injury. It is radiating to the left foot. What date are you talking about here? The 16th, the day after the alleged incident. All right. I agree that his symptoms were changed at that time. Because he's reporting, and he goes on to say, he has had no trauma recently. He's reporting it as a continuation of the same thing he's been having for four to five years and describing what was happening before the day before. I understand that that's what's in that record. I also would point out that the injured worker testified that he did tell Dr. Grieving that he had an incident at work. And that's corroborated by the fact that the same day that report was issued by Dr. Grieving, the same day, earlier that day, this man had been in the emergency room for that work injury and had reported to the emergency room physician he had been hurt and that there were specific findings of an acute injury at that time with a recommendation by the ER physician that he follow up with his family doctor with regard to that, which he did the same day. So the point is, I mean, you're saying that the symptoms were different after the accident, but his physician, Dr. Grieving, reported before and after the accident a long history of the exact same symptoms. Which symptoms are you talking about? Pain radiating down to his left leg. Okay. All right. Not just back. The doctor also, Dr. Grieving, also notes in there probable sciatica, which is a new diagnosis by Dr. Grieving. And the sciatica, of course, references the sciatic nerve, none of which had ever been mentioned in the past by the doctor. And that's the medical evidence in this case. I mean, the medical evidence supports the proposition that prior to March 15th of 2005, this man had some back pain. Well, is it really that important that we need to look for sciatica, which hadn't been mentioned previously? Some of the statements just made talked about the frequency with which the prior symptoms are now occurring. You see what I'm saying? They're occurring more frequently. And if that's the case, isn't your strongest argument that there's an intervention here, the incident in March, now the speed with which these symptoms are occurring are quicker, okay, more frequently, maybe more intense, et cetera? Doesn't that help in the aggravation theory? Well, you know, as I responded earlier, I think that this person had more than one diagnosis related to that accident. And I believe that the medical evidence supports the proposition that this aggravated the preexisting condition of low back pain and also that it created another condition, a torn disc at the L4-5 level. And that's what Dr. Park testified to. What about Dr. Chabot? Do we believe him? Well, the problem with Dr. Chabot's testimony in this case centered on a couple of things. First of all, Dr. Chabot doesn't see this person until more than three years after the accident. He sees him for a very brief period of time. And then he bases his opinions on incomplete medical records. For instance, he wasn't provided with the emergency room record, which demonstrates an acute injury the date of the accident. I think that's a big deal. I mean, I think that should be important to Dr. Chabot. But when I brought that up in cross-examination, he passed it off as if it's not important. It's important to him that there's a record from December of 2004 saying this person had back pain, even though it doesn't demonstrate neurologic symptoms. But it's not important to him in his opinion that the person reports to the emergency room within hours of the accident with neurologic symptoms. That doesn't affect his opinion in this case. Counselor, I have a question here. I seem to be confused about something. The arbitrator awarded this man nothing. Is that correct? Yes. And he specifically found that, concludes that the petitioner did not suffer an injury that arose out of in the course of his employment with the respondent on March the 15th, and awarded him nothing. The commission gets it on review, says it affirms the arbitrator, and then remands the case to the arbitrator for further proceedings to determine temporary total disability and permanent disability. That makes no sense. I won't disagree with that. I mean, you've got to be goofy to write a thing like that. That doesn't particularly make sense to me either. I point out another thing about Dr. Chabot. In his testimony to me, he talked about the nature of the injury to Houston. He didn't say that he didn't have an incident at work, but he says it doesn't sound like a significant injury or merely an exacerbation of long-standing conditions. Now, the problem with that is Dr. Chabot is a St. Louis physician, and he's applying the Missouri workers' compensation standard to an Illinois workers' compensation case. Of course, that's not our standard in Illinois. If this is an exacerbation of a long-standing condition, it's compensable. And therefore, I think you should carefully review what he said in this particular case and consider the fact that Dr. Chabot's, the foundation of his opinion, lacks crucial information, the ER record, and also, he did not review the diagnostic imaging study of the May of 2005 MRI that was done on this person's back, which demonstrated the torn disc at the L45 level. He didn't review that either. And yet, he came up with the opinion that this is not a significant, as he would say, not a significant injury. Dr. Park was questioned, and he did comment on the fact that what's being described to him sounded similar to what the symptoms were at the time that he saw him. But the issue is whether this person suffered an aggravation of that condition on March the 15th, and also, he testified that the March 15th of 2005 accident didn't cause the L45 annular tear. And the basis of his opinion were the medical, was the history given to him by Houston, the medical treatment that had been done up to that time, the diagnostic that he had reviewed, and he never did change his opinion concerning causation in this case. Counsel, please. May it please the court. My name is Steve Christensen. I'm here on behalf of the respondent, Natalie, in this case. And I'm not going to sit there and go through my brief. Obviously, you've read it. But I just wanted to comment on a couple of points that were brought up in the earlier argument. Can I ask you a couple of questions here? Sure. In light of the fact that I can't figure out what the commission did here, based on his wording, it's safe to assume, I believe, that neither of his treating physicians offered causation testimony. Is that right? Or they weren't asked? If you're talking about the physicians that saw him before Dr. Carter? Bernardini. Right. Did he give a causation opinion? No. Okay. He wasn't asked one. No. And who was the other one? Grieving? Grieving was his primary care physician. My understanding is, and I'm not 100% sure on this, but I believe that Dr. Grieving is retired and left the area. Okay. So he didn't give one either. He didn't give one either. So we've got two causation opinions. We've got Park and Chabot. Is that right? Yeah. It's pronounced Chabot. Chabot. Kill the French in me. I'm not good with the French. Okay. Park and Chabot. Correct. Park says there is a causal relationship. Right? He gives them a causation opinion. Is that correct? That's correct. He did. Chabot says, and I'll quote, It was my impression, given the description of the injury, where he essentially was wiping tables down, did not sound to me like a significant injury. It was my impression that his complaints were merely an exacerbation of his longstanding complaints. That was his opinion. Well, if his opinion was that it was an exacerbation of a longstanding complaint, and Park said there was a causal relationship, what evidence is there in the record for the arbitrator's finding that he did not suffer any injury that arose out of in the course of his employment on March the 15th? The medical records are fraught with evidence to that effect. But first of all, let me start with Dr. Chabot. Dr. Chabot said this was a temporary exacerbation. He said, if you read the entirety of his entire deposition testimony, that this man had prior low back problems, prior radiculopathy, that continued on. And one day, just like the many days before, he had a bad day. He testified, the petitioner did, that it waxed and waned. One day he has a good day, another day he has a bad day. And this was no different. And that's what Dr. Chabot's point was. And to get back to this argument about whether or not we have different symptoms after this event, I point you, and I just pulled this out while I was listening to the argument, this report from Dr. Grieving from March 16, 2005, specifically states, he has no numbness of the lower extremities, comma, no weakness. That's Mr. Foley's argument, is that this incident caused a new condition, that being numbness and weakness. But here it is the day after the accident, and he specifically pointed that out, that didn't exist. So what happened here pathologically that changed? And that's what Dr. Chabot is getting at. There wasn't any change here. There wasn't any aggravation. There wasn't any pathological change. There wasn't any change at all. Well, wasn't there something about later on there was a tear? There was, yes, and that's something that also Dr. Park and I believe Dr. Chabot are in agreement on, and that is you can't pinpoint when a tear occurs, particularly when you don't have a prior MRI. You can't relate it to March 15 because there was no prior MRI to say it wasn't there or wasn't there. It could have been there. It most likely was there. So, you know, they're in agreement on that. That's my understanding after reading both their testimonies. And I believe, and I'm doing this from memory now, but I believe the first time that there was any mention of any weakness or numbness from Dr. Grieving or any doctor, for that matter, after the emergency room record was back in July of 2005 after he finished his physical therapy and was basically discharged. And then he had this waxing and waning again, and so then he goes to Dr. Burgandy. Dr. Burgandy releases him, and that's a medical improvement, says he's doing well. And then he's waxing and waning again, and then he goes off to Dr. Park. Is Chabot saying that this event of March the 15th was totally insignificant in relation to this man's condition of well-being? He's saying he has a chronic problem. The chronic problem is going to wax and wane. He's going to have his good days. He's going to have his bad days. Work doesn't have anything to do with it. So what did Park say about the significance of the event? What did he say? Was he asked whether it was significant? I'm not sure. I don't recall if he was asked how significant it was. I think he was just asked, is the annular tear related or not? But then when I cross-examined him and said, no, wait a second. What about these prior medical records? I believe the words were similar or substantially similar. Complaints is what Dr. Park's words were. The complaints that were given to him were substantially similar or  The actual report into the hospital on the day of the alleged incident, that doesn't have any weight at all? Well, first of all, I read that report this morning. In the handwritten section, there's nothing about numbness or weakness. Nothing. But there's a checklist. And at the bottom of this checklist, in the middle of the page, it says numbness, weakness. There's a check there. But no doctor wrote out. He's complaining of it. And when I asked him in his testimony if he was complaining of numbness or weakness at the time of the hearing, he said no. Or at least he didn't testify of getting numbness or weakness at that time. He said he got radiating pain on occasion when he bent over or overdid it or stressed himself down his left leg. Well, counsel, to summarize, we have Park giving a causation opinion. We have Chabot giving sort of a qualified opinion. What evidence in the record can you point us to specifically that supports the commission's decision? In terms of the fact that this was just another waxing and waning. In terms of denial of the benefits. What evidence in the record supports the commission's decision? Well, I think, first of all, you have to look at Dr. Green's records. Particularly the day after the accident when his complaints were the same as on March 9th, seven days early. On March 9th, he noted when he strains are bent significantly, he often has shooting pain down his leg to his foot on the left side. That's the same complaint he had to Dr. Green on March 16th, the day after. There's no change here. And that's the crux of the issue. He's saying that there are new symptoms, new complaints here as a result. Does that mean weakness and numbness? But Green is saying the day after the accident, there is no weakness or numbness. So what happened here? And that's what Dr. Chabot is talking about. And I think it's a little disingenuous to throw out Dr. Chabot's opinion altogether simply because he didn't see the ER record. He met with the individual and asked him what his history was and he gave him the same history as what the history was in the emergency room record. So he had the same history. And so he was asked on redirect, if those histories are the same, would that change your opinion at all? Would that be significant to you? He said, no, he told me the same thing that was in the ER record. Also, there was brought up that he did a review of the May 2005 diagnostic study. Well, he may have not seen the film, but he saw the radiologist's report, which was in Dr. Burgandy's records. So he did see that Dr. Burgandy's records, the radiology report in there, and what the findings of that MRI were. I'll leave you with the rest of my time unless there's any additional questions. Thank you. Dr. Butler? I think the best evidence in the case for Mr. Houston, beyond Dr. Park's testimony in this case, is the actual medical records themselves. If you read the records, you'll see the differences in diagnoses before and after this accident. There is a change in diagnoses, including Dr. Greving. He changes his diagnoses for him. Additionally, Dr. Chabot reading a radiologist report is nothing more than hearsay. If he doesn't look at the film himself, then I don't see how he would be able to offer an opinion on what the film shows. Simply reiterating what someone else says doesn't really add anything to his opinion. The fact that he didn't look at the films means that he can't say what were on the films. The fact that he takes a history from the patient and the patient tells him what his symptoms were after the accident and does not look at the emergency room record to see what the physician noted down at the time he came in should cast doubt on the weight that should be given to Dr. Chabot's opinion. It should clearly cause his opinion to come into question here. To say that the report only has those things circled, that's why it's on the ER record report itself. They have sections in there to indicate the types of symptoms and what the doctor's findings are. The doctor noted he had leg numbness and weakness hours after this accident. We're not trying to prove that everything that Eric Houston felt in his back occurred after March the 15th of 05. We're trying to prove, we proved that what happened was he had three existing problems that were made worse by this accident and we have solid evidence that he suffered a torn L4-5 disc and that's why he needed more treatment as indicated by the volume of medical treatment that he had up to the point in time that had not made him better and that Dr. Park wanted to offer him additional and did offer him additional medical treatment for. You couldn't convince Commissioner DiMuno and Gore. You're correct. As we say, I can't explain their decision. I don't attempt to explain their decision. I think that the burden that I have is, with regard to manifest weight of the evidence, is I have to, the issue that presents itself is whether there is factual evidence in this record to support the decision and the problem is there is not factual evidence in this record to support the decision that this was not an aggravating injury to this man. There is not factual evidence in this record to show that the conditions he was receiving treatment for existed before that accident date and it was not even contested that he had this incident work. No one came in and disputed that he had this incident work. It's whether it represented an aggravating injury to this person and whether that should be compensable under Illinois law. And based on the evidence in this case, it should be. Thank you.